# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
SUSAN COTTINGHAM, on behalf of her    \*
minor child, K.C.,    \*    No. 15-1291
   \*
     Petitioner,    \*    Special Master Christian J.
   \*    Moran
v.    \*
   \*    Filed: March 30, 2017
SECRETARY OF HEALTH    \*
AND HUMAN SERVICES,    \*    Attorneys' fees and costs;
   \*    reasonable basis
     Respondent.    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Andrew D. Downing, Van Cott & Talamante, PLLC, Phoenix, AZ, for petitioner;
Ann D. Martin, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED DECISION DENYING ATTORNEYS' FEES AND COSTS[1]

     Susan Cottingham filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-10 through 34 (2012), on October 30, 2015, on behalf of her minor daughter, K.C.  However, the case was dismissed within a year of its filing.  Decision, 2016 WL 6575170 (Oct. 13, 2016).

     Although Ms. Cottingham did not receive compensation, she is requesting an award of attorneys' fees and costs as permitted by the Vaccine Act.  42 U.S.C. § 300aa–15(e).  As an unsuccessful petitioner, Ms. Cottingham is required to establish that reasonable basis supported the claims in her petition.  Because she

---

     [1]  The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this ruling on its website.  Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4).  Any redactions ordered by the special master will appear in the document posted on the website.

has failed to meet this predicate showing, Ms. Cottingham is not eligible for an award of attorneys' fees and costs.  Therefore, her motion is denied.

## Background

K.C. was born in 1998.  Her health through 2011 was relatively routine and overall good.

In March 2012, a Middle Creek Urgent Care facility diagnosed K.C. with mononucleosis.  A week later, K.C.'s regular pediatrician saw her.  K.C. stated that her throat was hurting, she felt tired, and she had headaches.  The doctor diagnosed her as having a viral illness on top of the mononucleosis.  Exhibit 3 at 55-56.

Before starting high school, K.C. returned to the pediatrician's office.  The doctor did not record any significant health concerns.  During this appointment, which occurred on July 5, 2012, K.C. received three vaccinations – the hepatitis A vaccine, the meningococcal conjugate vaccine, and the human papillomavirus (HPV) vaccine.  Exhibit 3 at 99-100.  Ms. Cottingham's claim rested upon the HPV vaccine.

Approximately one month later, while performing as a majorette in her school's band, K.C. twisted her right knee.  The pediatrician recorded that except for the problem with her right knee, a review of symptoms was "negative." Exhibit 3 at 64.  For the knee injury, K.C. went to physical therapy.  Exhibit 5.

On October 10, 2012, K.C. went to the Children's Hospital of Alabama where she saw a pediatric gynecologist.  The history of present illness from this visit states:

> She has periods that are monthly.  Sometimes there are 2 weeks in between and sometimes they are a full month in between.  When they do occur she does have to wear double protection on her for a few days because of the menorrhagia.  Her periods last for about 2 days and they are off for about 2 days and they come back for about 4-5 days.

Exhibit 9 at 4.  Except as noted in the history of present illness, the doctor's review of symptoms was "negative times 10."  Id.  The gynecologist prescribed oral contraception to control K.C.'s monthly cycle.

2

According to an affidavit K.C. signed for this litigation, her health changed on November 1, 2012 (almost four months after her receipt of the HPV vaccination).  K.C. stated: "I began getting regular weekly headaches. Over the next few weeks, not only did the frequency of headaches increase but I also began to experience episodes of near black-outs where my vision became temporarily impaired."  Exhibit 1 ¶ 5.  Ms. Cottingham's attorney asserted that November 1, 2012, marked the onset of the problems the HPV vaccine allegedly caused in K.C. Pet'r's Mot. for Attorneys' Fees and Costs, filed Oct. 26, 2016, at 5.

On November 30, 2012, K.C. returned to her pediatrician's office.  She complained about having a fever, yellow mucous, a sore throat in the mornings, and headaches "off and [on] all week."  The doctor diagnosed her as having "acute sinusitis."  Exhibit 3 at 87-88.

Approximately two months later, K.C. had another appointment with her pediatrician.  The history of present illness states that K.C.

> comes in today with 2 days of runny nose and
> congestion. Today she's had low-grade fever of 100.4,
> she has also had [a] sore throat along with runny nose
> and congestion.  Has had a headache today as well.  No
> cough, increased work of breathing or shortness of
> breath.  No vomiting or diarrhea.

Exhibit 3 at 78 (record created Jan. 31, 2013).  The doctor's assessment was "rhinitis" and "acute viral pharyngitis."  Id. at 79.

On March 29, 2013, K.C. "fainted upon getting up this morning."  She also had a fever and dizziness.  She vomited once.  The doctor's assessment was "gastroenteritis" and "dehydration."  The doctor believed that K.C. was "at the early stage of an intestinal virus."  Exhibit 3 at 80-81.  March 29, 2013 is 267 days (nearly 9 months) after July 5, 2012, the date of the first HPV vaccination.

K.C. fainted again on May 23, 2013, while at a pool.  The history of present illness from her treatment after this incident states that after waking up this morning, K.C. did not have anything to eat or drink.  When at the pool with a friend, K.C. felt "very hot" and "hungry" "so she stood up quickly to go get something to eat.  She says at that point her vision became black and she felt very light headed.  Soon after she fell backwards."  Exhibit 3 at 70.  The doctor thought that K.C. "was dehydrated prior to this event. [She] also [thought] laying out in the

sun may have contributed."  The doctor recommended that K.C. increase her intake of fluids.  Id. at 71.

On July 25, 2013, K.C. visited the pediatric cardiology clinic of the University of Alabama-Birmingham.  The history of present illness recounts the two incidents of fainting from March and May.  In addition, K.C. "has had other episodes of dizziness and near passing out.  With all the episodes, she is standing or walking.  She does not participate in any competitive athletics.  She does participate as a majorette.  She has not had any dizziness or syncope with physical activity."  Exhibit 3 at 111.  The doctor conducted various tests and determined that she had a "structurally and functionally normal heart.  This syncope/presyncope is consistent with a vasovagal etiology."  The doctor "emphasized aggressive fluid hydration."  Id. at 112.

Following the July 25, 2013 visit with the pediatric cardiologist, nearly eight months passed before the next medical record.  On March 14, 2014, K.C. went to the office of her pediatrician.  Her chief complaint was listed as "cough, congestion, [sore throat], low-grade fever."  The doctor's assessment was "cough," "acute viral pharyngitis," and "acute upper respiratory infection."  Exhibit 3 at 106.

K.C. again saw a pediatrician for a checkup on August 18, 2014.  The history of present illness states: "Been doing well. No concerns."  The office notes also indicate that the date of Casey's last menstruation was July 25, 2014.  They also say that an oral contraceptive was discontinued, although the date of discontinuance was not given.  At this appointment, K.C. received another dose of the hepatitis A vaccine, another dose of the meningococcal conjugate vaccine, and another dose of the HPV vaccine.  Exhibit 3 at 109-10.

Pursuant to a history given to a gynecologist in April 2015, K.C. took oral contraceptives until October or November 2014 when her prescription ran out.  This same history reports that K.C. had a menstrual period in December 2014, but none since that month.  Exhibit 7 at 7.  During the April 28, 2015 appointment, the gynecologist came to the impression that K.C. was suffering from "secondary amenorrhea."  The doctor also indicated that polycystic ovarian syndrome was possible.  The doctor ordered an ultrasound.  Id. at 9.

Because of problems scheduling the ultrasound, Ms. Cottingham called the office of K.C.'s pediatrician on May 14, 2015.  Ms. Cottingham was "concerned that the Gardasil series may have had something to do with the recent changes

noted in [K.C.'s] menstrual cycle.  Mom is requesting that a note be made in [her] chart regarding this concern."  Exhibit 3 at 175.

The day after this May 2015 phone call, Ms. Cottingham retained her current attorney, Andrew Downing.  Pet'r's Mot. at 4.  Within a few days, a paralegal was requesting information from Ms. Cottingham to obtain medical records. Timesheets, pages 9-10.

K.C. returned to the pediatric gynecology clinic of the University of Alabama-Birmingham on July 8, 2015.  The doctor recorded that her abnormal uterine bleeding was now resolved with the use of oral contraceptives.  The doctor continued the prescription.  Exhibit 7 at 11-13.

At the law firm, a paralegal continued the process of requesting and obtaining medical records throughout the summer of 2015.  On October 16, 2015, Mr. Downing reviewed the medical records received to date.  Timesheets, page 1. Shortly thereafter, Mr. Downing and his paralegal began working on a witness statement and drafting a petition. Timesheets, pages 1, 6.

Mr. Downing submitted the petition on October 30, 2015.  He maintained in it that K.C. first experienced symptoms of a condition the HPV vaccine caused on November 1, 2012.  Therefore, in Mr. Downing's view, the 36-month statute of limitations expired on November 1, 2015.  Pet'r's Mot. at 5.

The petition was not very specific.  The introductory paragraph alleged that K.C. suffered "a severe adverse reaction."  Paragraph four of the petition references headaches that began on November 1, 2012.  Paragraphs six and seven refer to episodes of fainting in March and May 2013, respectively.  Paragraph nine asserts that K.C. began having menstrual problems in the latter part of 2013.

Over the next few months, Mr. Downing's office obtained more medical records and filed them.  On March 15, 2016, Mr. Downing submitted a statement of completion, representing that Ms. Cottingham had filed all the medical records of which she was aware.

On March 28, 2016, a status conference was held.  The Secretary stated that he was concerned about the reasonable basis for the petition.  In response, Mr. Downing stated that Ms. Cottingham would attempt to retain an expert.  See order, issued Mar. 28, 2016.

Mr. Downing called one doctor, whom Mr. Downing has retained in other Vaccine Program cases, Dr. Nemechek.  However, Dr. Nemechek did not provide a favorable opinion.  After consulting Ms. Cottingham, Mr. Downing consulted a second expert, Dr. Lee.  However, Dr. Lee also could not provide a favorable opinion.  See Pet'r's Mot. at 6-7.

On October 6, 2016, Ms. Cottingham filed a motion for a decision.  The ensuing October 13, 2016 decision dismissed Ms. Cottingham's case due to a lack of evidence.

On October 26, 2016, Ms. Cottingham filed the pending motion for attorneys' fees and costs.  She devoted one section of her accompanying brief to an argument that reasonable basis supported her petition.  Ms. Cottingham primarily contends that her attorney was required to file her petition before the expiration of the time set by the statute of limitations.  Therefore, the standard for evaluating reasonable basis should be more lenient.  Id. at 7.

The Secretary disagreed.  He argued that Ms. Cottingham's case lacked a reasonable basis.  To the Secretary, the pendency of the statute of limitations does not affect the analysis of reasonable basis.  Resp't's Resp., filed Nov. 14, 2016.

Ms. Cottingham submitted a reply, reinforcing and repeating her arguments regarding reasonable basis.  Pet'r's Reply, filed Nov. 28, 2016.  Ms. Cottingham added that an attorney's leaving a potential petitioner with only a short time either to find a new attorney to represent her or to file a case pro se would be tantamount to an ethical violation.  Id. at 4, citing Simmons v. Sec'y of Health & Human Servs., No. 13-825V, 2016 WL 59378528, at *3 (Fed. Cl. Spec. Mstr. Apr. 14, 2016).[2]

---

[2] Although Ms. Cottingham's reply brief accurately cites Simmons, Simmons, itself, cites no authority for the proposition that the specified conduct would constitute an ethical violation. Usually, an attorney is obligated to attempt to verify the client's account before filing a lawsuit. The degree of diligence that fulfills an attorney's ethical responsibility depends, in part, on the amount of time available for the investigation.  See Rule 3.1 Model Rule of Professional Conduct; Douglas R. Richmond et al., Professional Responsibility in Litigation 2-20 (2d ed. 2016).

The Wisconsin Court of Appeals brought out some of the nuances regarding an attorney's ethical duty to investigate a claim:

An attorney may rely upon his or her client for the factual basis for a claim when the client's statements are objectively reasonable, but

Respondent submitted a sur-reply noting that the Court granted a motion for review in Simmons.  Resp't's Notice of Add'l Auth., filed Nov. 28, 2016.  The Court stated: "[A] statute of limitations deadline does not excuse counsel from endeavoring to confirm that the vaccine injury alleged has occurred by producing supporting evidence."  Simmons v. Sec'y of Health & Human Servs., 128 Fed. Cl. 579, 584 (2016).  With the submission of the sur-reply, the motion is ready for adjudication.[3]

## Standards for Eligibility for Attorneys' Fees

Under the "American rule," each litigant pays for its participation in litigation.  Baker Botts, L.L.P. v. ASARCO, L.L.C., 135 S.Ct. 2158, 2160 (2015).  However, the Vaccine Act (like many other statutes) shifts the responsibility for fees under certain circumstances.  First, when a petitioner in the Vaccine Program receives compensation, the special master "shall" award reasonable attorneys' fees and costs.  42 U.S.C. § 300aa–15(e)(1).  Because Ms. Cottingham did not receive compensation, an award of attorneys' fees is not mandatory in this case.  Instead,

---

> this does not mean that an attorney always acts reasonably in accepting a client's statements.  Whether it is reasonable to rely on one's client depends in part upon whether there is another means to verify what the client says without discovery.  A party and attorney may not rely on formal discovery after the filing of a suit to establish the factual basis for the cause of action when the required factual basis could be established without formal discovery.  In addition, in deciding whether to rely on one's client for the factual foundation of a claim, an attorney must carefully question the client and determine if the client's knowledge is direct or hearsay and is plausible; the attorney may not accept the client's version of the facts on faith alone. . . . While the investigation need not be to the point of certainty to be reasonable . . . the signer must explore readily available avenues of factual inquiry rather than simply taking a client's word.

Wisconsin Chiropractic Ass'n v. State, 676 N.W.2d 580, 589-90 (Wis. Ct. App. 2004) (citations omitted).  In Arizona, where Mr. Downing practices, attorneys are required to "inform themselves about the facts of their clients' cases."  In re Alexander, 300 P.3d 536, 540 (Ariz. 2013) (en banc) (quoting Rule 3.1 cmt. 2 of the Arizona Rules of Professional Conduct) (upholding determination that attorney violated Rule 3.1).

[3] After the Secretary filed his sur-reply, the petitioner in Simmons filed an appeal to the Federal Circuit on December 23, 2016.  Fed. Cir. No. 2017-1405.  Simmons remains pending.

her attorney relies upon a second provision in the Vaccine Act.  When the petitioner does not receive compensation, "the special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought."  Id.  Thus, non-prevailing petitioners must establish two conditions precedent for being eligible for an award of attorneys' fees:  "good faith" and "reasonable basis."  Here, resolution of Ms. Cottingham's good faith is not required because the remaining element (whether "there was a reasonable basis for the claim for which the petition was brought") is dispositive.

The Federal Circuit has not interpreted this phrase or provided any guidance as to how petitioners satisfy the reasonable basis standard.  Chuisano v. Sec'y of Health & Human Servs., 116 Fed. Cl. 276, 285 (2014) (citing Woods v. Sec'y of Health & Human Servs., 105 Fed. Cl. 148 (2012)).  In the absence of guidance, special masters have taken different approaches.  Silva v. Sec'y of Health & Human Servs., No. 10-101V, 2012 WL 2890452, at *8-10 (Fed. Cl. Spec. Mstr. June 22, 2012), mot. for rev. denied, 108 Fed. Cl. 401 (2012).  In reviewing special masters' decisions on reasonable basis, the Court of Federal Claims has sometimes examined whether the special master's decision, either finding or not finding reasonable basis, was an abuse of discretion.  See, e.g., Allicock v. Sec'y of Health & Human Servs., 128 Fed. Cl. 724, 727 (2016); Graham v. Sec'y of Health & Human Servs., 124 Fed. Cl. 574, 579-80 (2015).

Recent decisions have examined whether any evidence supports "the claim for which the petition was brought."  The statute's use of the phrase "reasonable basis for the claim for which the petition was brought" is consistent with other portions of the statute that require the petition to be filed with evidence.  See Chuisano v. Sec'y of Health & Human Servs., No. 07-452V, 2013 WL 6234660, at *8-10 (Fed. Cl. Spec. Mstr. Oct. 25, 2013), mot. for rev. denied, 116 Fed. Cl. 276 (2014).[4]  Evidence that is relevant to determining whether there is reasonable basis

---

[4] Although the undersigned's decision in Chuisano indicated that petitioners may satisfy the reasonable basis standard by submitting "evidence," the former Chief Judge in some respects agreed and in some respects disagreed.  The former Chief Judge agreed with the emphasis on "evidence."  But, the former Chief Judge also stated that a more flexible standard would be appropriate, one that took into account the "totality of the circumstances."  Chuisano, 116 Fed. Cl. at 286.

for a claim may include medical records, affidavits from percipient witnesses, and opinions from retained experts.  See 42 U.S.C. § 300aa–11(c).

When some (as yet undefined) quantity and quality of evidence supports the claim for which the petition was brought, then the petitioner satisfies the reasonable basis standard.  However, when the only evidence supporting the claim that the vaccine caused an injury is a sequence of events in which the vaccination preceded the injury, then the petitioner does not satisfy the reasonable basis standard.  Chuisano, 116 Fed. Cl. at 287 ("Temporal proximity is necessary, but not sufficient.").

"The burden is on the petitioner to affirmatively demonstrate a reasonable basis."  McKellar v. Sec'y of Health & Human Servs., 101 Fed. Cl. 297, 305 (2011), decision on remand vacated, 2012 WL 1884703 (May 3, 2012).

## Analysis

As set forth above, the parties advance different interpretations of the way "reasonable basis" can be established.  Ms. Cottingham urges an evaluation of the "totality of the circumstances," including the perceived running of the statute of limitations.  See Pet'r's Mot. at 7.  In contrast, the Secretary argued that reasonable basis focuses on evidence, and that the statute of limitations does not change the standard.  See Resp't's Resp. at 11-13.

In light of the parties' dispute, the initial task is to determine whether the statute of limitations affects the meaning of "reasonable basis" as that term is used in the Vaccine Act.  See section I, below.  The subsequent step is to assess whether Ms. Cottingham meets the reasonable basis standard under either the evidence-based interpretation or the totality of the circumstances interpretation.  See section II, below.

---

At first blush, the "totality of the circumstances" test may seem different from the undersigned special master's approach to looking at the evidence.  However, the issues the former Chief Judge identified as part of the totality of the circumstances analysis are, generally speaking, issues resolved by analyzing evidence.  The primary difference between the two opinions in Chuisano is whether petitioner's attorney's actions are relevant to the reasonable basis inquiry.

I.    **Whether the Passage of Time Changes the Reasonable Basis Standard**

Ms. Cottingham relies upon cases from special masters for the proposition that a lenient standard for reasonable basis is appropriate when the impending expiration of the statute of limitations prevents an adequate investigation.[5]  See Pet'r's Mot. at 2-3; Pet'r's Reply at 1-2.  For his part, the Secretary responds that "these determinations have been in error."  Resp't's Resp. at 11.  In addition, as decisions from special masters, Garrett, Austin, etc. are not binding authority.  Hanlon v. Sec'y of Health & Human Servs., 40 Fed. Cl. 625, 630 (1998), aff'd, 191 F.3d 1344 (Fed. Cir. 1999).

Although all the cases Ms. Cottingham cited have been reviewed, an extensive discussion of these cases is not necessary.  The more recently decided cases tend to cite the older cases.  At the root level, when the cases provide a reason for using a lenient or low standard to evaluate reasonable basis, the given reason is usually the same — to advance the public policy of having attorneys represent petitioners in the Vaccine Program.  Although not in the context of discussing reasonable basis, the Federal Circuit has stated a "secondary purpose of the [Vaccine] Act is to ensure that vaccine-injury claimants will have readily available a competent bar to prosecute their claims under the Act."  Saunders v. Sec'y of Health & Human Servs., 25 F.3d 1031, 1035 (Fed. Cir. 1994).  Yet, in a separate case holding that a special master was not arbitrary in denying attorneys' fees and costs due to a lack of reasonable basis, the Federal Circuit stated "Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorneys' fees and costs by merely having an

---

[5] The cases Ms. Cottingham cites include Garrett v. Sec'y of Health & Human Servs., No. 14-16V, 2014 WL 6237632, at *3 (Fed. Cl. Spec. Mstr. Oct. 27, 2014); Austin v. Sec'y of Health & Human Servs., No. 10–362V, 2013 WL 659574, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2013); McNett v. Sec'y of Health & Human Servs., No. 99-684V, 2011 WL 760314, at *8 (Fed. Cl. Spec. Mstr. Feb. 11, 2011); Lamar v. Sec'y of Health & Human Servs., No. 99–583V, 2008 WL 3845165, at *4 (Fed. Cl. Spec. Mstr. July 30, 2008); Hamrick v. Sec'y of Health & Human Servs., No. 99-683V, 2007 WL 4793152, at *5 (Fed. Cl. Spec. Mstr. Jan. 9, 2008); Turner v. Sec'y of Health & Human Servs., No. 99-544V, 2007 WL 4410030, at *7 (Fed. Cl. Spec. Mstr. Nov. 30, 2007); Turpin v. Sec'y of Health & Human Servs., No. 99-564V, 2005 WL 1026714, at *2 (Fed. Cl. Spec. Mstr. Feb. 10 2005); Hearell v. Sec'y of Health & Human Servs., No. 90-1420V, 1993 WL 129645, at *1 (Fed. Cl. Spec. Mstr. Apr. 6, 1993).

expert state an unsupported opinion." Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994).

At first glance, Saunders and Perreira may seem to point in opposite directions — Saunders suggesting that special masters should compensate petitioners' attorneys readily and Perreira suggesting that special masters should restrict payment to petitioners' attorneys in some circumstances. However, the context of these expressions about Congressional policy provide additional information. See Bristol-Myers Squibb Co. v. Teva Pharmaceuticals USA, Inc., 769 F.3d 1339, 1353 (Fed. Cir. 2014) (Taranto, J., dissenting from denial of a petition for rehearing en banc) ("It is a well-recognized principle, and one essential to our system of precedent, that statements in opinions must be read in context, considering their role in the decision and the facts of the case").

The background to Perreira comes from a 1991 decision denying compensation. The Perreiras alleged that a 1982 administration of the diphtheria-pertussis-tetanus ("DTP") vaccine harmed their daughter, Carly. Initially, the Perreiras maintained that Carly started having seizures four days after the second dose of DTP, based upon the testimony of Carly's mother. The former Chief Special Master found that Ms. Perreira's testimony was not correct and found, instead, that the seizures started 20 days after the second dose of DTP. Perreira v. Sec'y of Health & Human Servs., No. 90-847V, 1991 WL 117740, at *1 & n.2 (Cl. Ct. Spec. Mstr. June 13, 1991).

Given this sequence of events, the Perreiras attempted to establish a significant aggravation claim. This alternative claim was based upon the sequence that two weeks after the third dose of DTP, Carly had more seizures. The former Chief Special Master rejected the Perreiras' claim because there was no support for their expert's opinion that DTP causes harm that would first appear two weeks later. Id.

After the entitlement proceedings concluded, the Perreiras sought an award of their attorneys' fees and costs. The former Chief Special Master found that the Perreiras had a reasonable basis for filing their petition. Perreira v. Sec'y of Health & Human Servs., No. 90-487V, 1992 WL 164436, at *2 (Cl. Ct. Spec. Mstr. June 12, 1993). The decision does not state the reason for finding reasonable basis, but the facts suggest that this finding may have been premised upon the assertion that Carly's seizures started four days after the second dose of vaccination.

11

The former Chief Special Master explicitly found that the reasonable basis ceased after the expert submitted a report, noting that the expert's theory "amounted to his own unsupported speculation[,]" and that the Perreiras' attorney should have recognized that the expert's theory "was legally insufficient to establish causation." The former Chief Special Master also stated that the Perreiras' attorney recognized that this case "was a 'bad case.'" Id. at *1-2.

The Perreiras filed a motion for review of the denial of a portion of the attorneys' fees and costs. The Court of Federal Claims found that the former Chief Special Master's determination that the case lacked a reasonable basis was not arbitrary. The Court of Federal Claims rejected the petitioners' arguments, including an argument that "counsel had an absolute right to rely on the expert's opinion in pursuing the case." Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 33 (1992).

These decisions are the background for the Federal Circuit's discussion of "reasonable basis" in its Perreira decision. The Federal Circuit affirmed the former Chief Special Master's decision that the Perreiras lacked a reasonable basis to proceed to a hearing, despite an expert report, because "the expert opinion was grounded in neither medical literature nor studies." The Federal Circuit explained that "[t]he special master did not require counsel to verify the validity of the expert's opinion, but only required the opinion to be more than unsupported speculation." Perreira, 33 F.3d at 1377.

Perreira remains valid precedent.[6] It demonstrates that special masters enjoy discretion to find that a claim lacked a reasonable basis when the evidence on which the petitioners relies (there, an expert's report) is rooted in unsupported speculation. In this context, the Federal Circuit seemed to give some teeth to the term "reasonable basis." The Federal Circuit declared: "Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorneys' fees and costs by merely having an expert state an unsupported opinion." 33 F.3d at 1377.

---

[6] Despite being issued more than 15 years ago, Perreira has not been overruled by an en banc decision of the Federal Circuit. See Cedillo v. Sec'y of Health & Human Servs., 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing Perreira).

On the other hand, the Federal Circuit seemed to support a greater openness to paying petitioners' attorneys for unsuccessful cases in <u>Saunders</u>. There, Ms. Saunders alleged that the DPT vaccine caused her son, Chad, to suffer seizures and profound developmental delay. However, she did not establish that she was entitled to compensation. <u>Saunders v. Sec'y of Health & Human Servs.</u>, No. 90-826V, 1991 WL 274235 (Cl. Ct. Spec. Mstr. Dec. 9, 1991). She did not file a motion for review of this decision and judgment entered. She also rejected this judgment allowing her, pursuant to 42 U.S.C. § 300aa-21(a), to pursue a civil action. <u>Saunders</u>, 25 F.3d at 1032 (setting forth procedural background).

The ensuing decisions and opinions from successive tribunals considered whether Ms. Saunders's rejection of the judgment prevented an award of attorneys' fees and costs. The special master awarded attorneys' fees and costs, finding that Ms. Saunders satisfied the good faith and reasonable basis standard. <u>Saunders v. Sec'y of Health & Human Servs.</u>, 90-826V, 1992 WL 700268 (Cl. Ct. Spec. Mstr. May 26, 1992). After the Secretary filed a motion for review arguing that the petitioner's rejection of the judgment regarding entitlement foreclosed an award of attorneys' fees and costs, the Court held that the special master did not err. <u>Saunders v. Sec'y of Health & Human Servs.</u>, 26 Cl. Ct. 1221 (1992).

The Secretary then appealed to the Federal Circuit. There, the case involved how various provisions of the Vaccine Act interacted. As such, the appeal involved a "legal question" that the Federal Circuit reviewed "de novo." <u>Saunders</u>, 25 F.3d at 1033.

Essentially, the Federal Circuit was asked to determine whether the Vaccine Act permitted both a judgment on entitlement, which the petitioners could reject, and a judgment awarding attorneys' fees. Although the Secretary had argued that "for purposes of the election requirements of 42 U.S.C. §§ 300aa-15(f) and -21(a), the term 'compensation' necessarily encompasses both the payment of attorneys' fees and costs and the payment of an award on the merits under the Program[,]" <u>id.</u> at 1034, the Federal Circuit interpreted the Vaccine Act as permitting more than one judgment:

> [W]e read "compensation" in the context of 42 U.S.C. §§ 300aa-15(f)(1) and -21(a) as referring to payment for the compensatory damages referenced in 42 U.S.C. § 300aa-15(a) to (d), not payment of attorneys' fees and costs. Thus, we conclude that when the Vaccine Act requires an election to accept the court's judgment before the

13

> payment of "compensation," it is referring to
> "compensation" in the sense of payment for the kinds of
> expenses and losses which are referenced in 42 U.S.C.
> § 300aa-15(a) to (d).

Id. at 1035.  In addition to this text-based approach to interpreting the Vaccine Act,
the Federal Circuit also concluded that its interpretation was consistent with
Congress's purpose in creating the Vaccine Program "to make the scheme
compatible with tort law under the federal system."  Id.

After this analysis, the Federal Circuit made the comment on which many
unsuccessful petitioners who seeking a finding of reasonable basis rely:  "A
secondary purpose of the Act is to ensure that vaccine-injury claimants will have
readily available a competent bar to prosecute their claims under the Act."  Id. at
1035.  However, petitioners are not always mindful that the Federal Circuit
continued:  "This secondary purpose, which is effected by permitting the award of
attorneys' fees and costs both to prevailing and non-prevailing claimants, is present
regardless of whether or not a claimant receives compensation for his or her injury,
and whether or not the claimant elects to accept the judgment under the Act."  Id.
at 1035-36.

Thus, it seems that in Saunders the Federal Circuit analyzed the text and
structure of the Vaccine Act to conclude, as a matter of statutory interpretation,
that the rejection of an entitlement judgment did not preclude the subsequent award
of attorneys' fees and costs.  In reaching this conclusion, the Federal Circuit
recognized that Congress permitted both prevailing and non-prevailing petitioners
to receive awards of attorneys' fees and costs.  While the Vaccine Act expands the
group of petitioners who are eligible for awards of attorneys' fees by not limiting
that group to prevailing petitioners, "no law pursues its purposes at all costs."
Rapanos v. United States, 547 U.S. 715, 752 (2006) (plurality opinion).  Instead,
according to a plurality opinion of the United States Supreme Court, "the textual
limitations upon a law's scope are no less a part of its 'purpose' than its substantive
authorizations."  Id.  Here, the requirement that an unsuccessful petitioner have "a
reasonable basis for the claim for which the petition was brought" is one such
textual limitation to a purpose of the Vaccine Act.  In Saunders, the Federal Circuit
did not directly address the meaning of "reasonable basis" because the special
master had made a finding in Ms. Saunders's favor and the Secretary did not seek
review of this finding.

14

In advancing the policy goal of compensating attorneys to incentive them to represent more petitioners in the Vaccine Program, the cases on which petitioner relies do not accord the term "reasonable basis" sufficient weight.  See Saunders, 25 F.3d at 1035 ("It is a settled rule of statutory interpretation that a statute is to be construed in a way which gives meaning and effect to all its parts"); Terran v. Sec'y of Health & Human Servs., 195 F.3d 1302, 1310 (Fed. Cir. 1999) ("The first and most important step when interpreting a statute is, of course, analyzing its text").

Ms. Cottingham has offered no argument based on the text of the Vaccine Act that supports an interpretation of the reasonable basis standard that depends upon the statute of limitations.  The term "reasonable basis" appears once in the Vaccine Act and that appearance is in the section concerning attorneys' fees.  42 U.S.C. § 300aa–15(e).  The section on attorneys' fees does not reference the statute of limitations, which is found in section 16.  The solitary appearance of the term "reasonable basis" suggests that the term has a single meaning.

Further, the text of the Vaccine Act links "reasonable basis" and "the claim for which the petition was brought."  By authorizing attorneys' fees and costs for cases in which "there was a reasonable basis for the claim for which the petition was brought," (section 15(e)), Congress referenced the provisions for bringing a petition (section 11).  This reference to section 11 anchors the reasonable basis inquiry to the petition and associated documents.  See Chuisano, 2013 WL 6234660, at *15.  This connection indicates that in evaluating whether there is reasonable basis, special masters should look to the basis (evidence) for the claim.  Actions of an attorney are not evidence.  Even an attorney's decision to file a petition shortly before the (perceived) expiration of the statute of limitation is not evidence that affects the merit of the "claim for which the petition was brought."  Ms. Cottingham's emphasis on Mr. Downing's action is tantamount to rewriting the Vaccine Act's provision so that it would say something like "a reasonable basis for filing the petition."  It might be good if the Vaccine Act said that, but the duty of judicial officers "is limited to interpreting the statute as it was enacted, not as it arguably should have been enacted."  Beck ex rel. Beck v. Sec'y of Health & Human Servs., 924 F.2d 1029, 1034 (Fed. Cir. 1991).

To be sure, in the absence of guidance from the Federal Circuit, the meaning of reasonable basis is elusive.  For a lengthy history of how reasonable basis has been treated, see Silva, 2012 WL 2890452, at *9–12.  The evidence-based approach to reasonable basis is an attempt to abide by all the provisions of the

15

Vaccine Act, starting with the obligation that Congress expected petitioners to file front-loaded petitions with "supporting documentation, demonstrating" five elements.  42 U.S.C. § 300aa–11(c)(1).  Notably, one of these items, which is set forth in paragraph (C), concerns causation.  The petition should include "supporting documentation" showing that the vaccinee "sustained . . . any injury . . . which was caused by a vaccine."  42 U.S.C. § 300aa–11(c)(1)(C)(ii)(I).  The statute does not exempt petitioners who are filing a petition close to the expiration of the statute of limitations from this requirement.[7]

In sum, as a proposition of law, the assertion that the pendency of the statute of limitations affects how special masters determine whether "there was a reasonable basis for the claim for which the petition was brought" appears to rest more on policy than the statute's text.  Ms. Cottingham has not tied her argument to the Vaccine Act.  In contrast, the Vaccine Act suggests that the reasonable basis standard is fulfilled (or not fulfilled) by measuring the evidence submitted in support of "the claim for which the petition was brought."

--------

[7] In addition to remaining consistent with the text of the statute, an evidence-based approach to determining reasonable basis preserves the objective nature of the reasonable basis analysis.  Special masters would not be required to how close to the expiration of the statute of limitations does the first consultation need to occur for the attorney to benefit from a reduced standard for evaluating reasonable basis?  For example, in the case at bar, Ms. Cottingham retained Mr. Downing approximately five months before the time, according to Mr. Downing, for filing the petition expired.  The Secretary suggests that five months is sufficient for an attorney to evaluate the case.  See Resp't's Resp. at 11 ("Simply put, this is not a case where counsel was approached by petitioner on the eve of the limitations deadline").

Even if a special master decided that the consultation between the petitioner and the petitioner's attorney occurred so close to the expiration of the statutory deadline that the petitioner deserved the benefit of a relaxed standard for evaluating the reasonable basis, what does this relaxed (or lenient, or lower) standard mean?  Do allegations from a petitioner that the petitioner thinks the vaccine harmed him (or her) suffice?  Can the filing of a petition, and nothing more, confer reasonable basis?  If so, would that analysis be tantamount to granting the petitioner a presumption in favor of a finding of reasonable basis?   The cases on which Ms. Cottingham relies (see footnote 5 above) do not wrestle with, let alone resolve, these questions.

## II.   Whether Ms. Cottingham Satisfied the Reasonable Basis Standard

As previously explained, the parties proposed two different tests, one focusing on evidence, and the other endorsing a review of the attorneys' actions in some circumstances.  However, the selection of tests is not important because the result is the same.  The analysis begins with a review of the evidence.

### A.   Evidence of Reasonable Basis

When making a decision regarding entitlement, the Vaccine Act specifies the type of evidence on which a special master may rely:  "medical records or medical opinion."  42 U.S.C. § 300aa–13(a)(1).  By extension, this same type of information is useful to deciding whether reasonable basis supports the claims in the petition.[8]

Here, the analysis is simple.  In the two briefs regarding attorneys' fees and costs, Ms. Cottingham does not identify any treating doctor who associated a vaccination with any medical problem.  Similarly, an independent review has not located any such record.

As for an opinion from a retained expert, Ms. Cottingham did not present one.  Through her attorney, she consulted two doctors.  Neither Dr. Nemechek nor Dr. Lee offered an opinion that a vaccination harmed K.C.

Thus, there is no evidence to support the petition's vaguely asserted claims that the HPV vaccination caused K.C.'s headaches, fainting, or menstrual problems.  This lack of evidence means that there is no reasonable basis for the petition.  Pursuant to the undersigned's preferred interpretation of reasonable basis in which only evidence in the form of "medical records or medical opinions" contributes to the analysis of reasonable basis, the examination would conclude here.

---

[8] In contrast, when deciding whether a petitioner acted in good faith in filing the petition, the special master may look to other evidence, such as affidavits, because the good faith aspect of the case is subjective.

17

**B.     Totality of the Circumstances, including
Actions and Omissions of the Attorney**

Some non-binding precedent indicates that the actions of an attorney should be considered in examining whether there is a reasonable basis for the claim for which the petition was brought.  Even under a "totality of the circumstances" analysis, Ms. Cottingham has not established the reasonable basis for the claims in the petition that the HPV vaccination caused chronic headaches beginning on November 1, 2012, the HPV vaccination caused fainting in March and May 2013, and the HPV vaccination caused menstrual problems beginning in the latter part of 2013.  See Pet. ¶¶ 4, 6-7, 9.

In the "totality of the circumstances," the degree of the attorneys' diligence, including the review of information available to the attorney before the filing of the petition, is critical.  Rehn v. Sec'y of Health & Human Servs., 126 Fed. Cl. 86, 93 (2016) ("If an attorney does not actively investigate a case before filing, the claim may not have a reasonable basis and so may not be worthy of attorneys' fees and costs"); Chuisano, 116 Fed. Cl. at 291.  Therefore, the following analysis of the reasonable basis for three claims asserted in Ms. Cottingham's petition takes into account only the medical records that Mr. Downing received before he filed the petition.[9]  For example, the timesheet shows that the law firm received records from Vestavia Pediatrics by June 23, 2015.  Timesheets, pages 4 and 10.  These records provide critical information in assessing the reasonableness of the headache, fainting, and menstrual difficulty claims in Ms. Cottingham's petition.

Assessing each of the claims in light of the information available at the time of the petition identifies two serious issues with each claim.  The issues surrounding headaches, fainting, and menstrual difficulties are addressed separately below.

1.     Headaches

The petition alleges that starting on November 1, 2012, K.C. "began to have headaches unlike anything she experienced before and she soon began to have these headaches on a regular basis."  Pet. ¶ 4.  The petition cites K.C.'s affidavit, which alleges that after November 1, 2012, K.C. "began getting regular weekly

---

[9] The evaluation, therefore, depends upon the straightforward and explicit identification of medical records from different providers in the attorneys' and paralegal's timesheets.

headaches."  Exhibit 1 ¶ 5.  She "also began to experience episodes of near black-outs where [her] vision became temporarily impaired."  Id.

Two independent reasons undermine the reasonable basis for this claim.  First, the records from Vestavia Pediatrics tell a different story.  K.C. saw a pediatrician on November 30, 2012.  She complained that she was having headaches "off and [on] all week."  Exhibit 3 at 87.  If K.C. had been having recurring headaches since November 1, 2012, she would have told the doctor the headaches had been "off and on all month."  The contemporaneously created record, however, says "week" and there is a rebuttable presumption that this record is accurate.  See Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Moreover, the report of this recurring, week-long headache was in the context of having a fever, yellow mucous, and a sore throat.  Exhibit 3 at 87.  These symptoms plus the doctor's evaluation of K.C. led the doctor to diagnose her as having "acute sinusitis."  Id. at 88.  In common parlance, the doctor thought she had a cold.

While the discrepancy between K.C.'s affidavit and the November 30, 2012 medical record might be reconciled in Ms. Cottingham's favor if other medical records supported K.C.'s allegations, the next medical record from Vestavia Pediatrics further undermines what she told her attorney years later.  On January 31, 2013, the history of present illness for this appointment states in pertinent part: "comes in today with 2 days of runny nose and congestion.  Today she's had low-grade fever of 100.4, she has also had [a] sore throat along with runny nose and congestion.  Has had a headache today as well."  Exhibit 3 at 78 (emphasis added).

As the Secretary pointed out (Resp't's Resp. at 6-7), this report indicates that K.C. had a headache "today."  While Ms. Cottingham argues that the report does not say the headache has lasted only one day (Pet'r's Reply at 5-6), this contention ignores the context.  For runny nose and congestion, the doctor's contemporaneously created record says that she has had these symptoms for two days.  This distinction suggests that the historian could distinguish between symptoms that started on the day of the medical appointment from symptoms that had a longer duration.

Additionally, one would expect that if K.C. were experiencing regular weekly headaches since November 1, 2012, she would have mentioned these frequent episodes.  However, in the Secretary's view, "the medical documentation

fails even to show that K.C. suffered chronic headaches." Resp't's Resp. at 5. Ms. Cottingham, in her reply, did not contest the lack of medical support for chronic headaches. Thus, the records from Vestavia Pediatrics should have alerted Mr. Downing that the allegation of weekly headaches was unsupported.

These points call into question the accuracy of the allegation that K.C. suffered recurring headaches at all. Of course, it is part of a petitioner's case to establish that she (or he) suffered the condition that the vaccination allegedly caused. Broekelschen v. Sec'y of Health & Human Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010).

The second reason for not finding reasonable basis supporting the petition's claim that the July 5, 2012 HPV vaccination caused K.C. to have headaches beginning November 1, 2012, concerns the temporal sequence. After a petitioner establishes the accuracy of the diagnosis, the petitioner must establish, through preponderant evidence, "the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." Bazan v. Sec'y of Health & Human Servs., 539 F.3d 1347, 1352 (Fed. Cir. 2008).

Here, again, Mr. Downing knew or should have known that Ms. Cottingham's claims were problematic. Even if the assertion in K.C.'s affidavit regarding the onset of headaches could be credited, the interval between the vaccination, which occurred on July 5, 2012, and the alleged onset on November 1, 2012, is 119 days, nearly four months. Ms. Cottingham's briefs do not cite any case in which special masters have accepted four months as an appropriate time from which to infer causation. The omission tends to show a lack of diligence because with minimal investigation Mr. Downing should have realized that four months is outside the typical temporal window. See Brannigan v. Sec'y of Health & Human Servs., No. 14-675V, 2016 WL 3886297, at *7 (Fed. Cl. Spec. Mstr. June 17, 2016) ("Counsel knew or should have known from the medical records in her possession . . . that the temporal relationship between the vaccinations alleged in the Petition and the injuries claimed to be associated with those vaccines were too remote in time to be causally related"), mot. for rev. dismissed, 2016 WL 7338616 (Fed. Cl. Nov. 23, 2016).

Thus, the headache claim is problematic for two separate reasons. K.C.'s account is not consistent with the Vestavia Pediatric records, which Mr. Downing had obtained before filing the petition. In addition, the proposed temporal sequence does not fit with any cases. If Mr. Downing had recognized that the

20

flaws in the headache claim, which Mr. Downing asserted began on November 1, 2012, then Mr. Downing would not have had an urgency to meet a deadline for filing the petition by November 1, 2015.  If so, then Mr. Downing could have explored the other two claims before filing them.

### 2.  Fainting in March and May 2013

Two reasons also undercut the petition's claims that the HPV vaccination caused fainting.  The first problem is the temporal interval between the July 5, 2012 vaccinations and the two episodes of fainting.  The interval to the first fainting episode, which occurred on March 29, 2013, is 267 days.  The interval to the second fainting episode, which occurred on May 23, 2013, is 322 days.

Vaccinations may cause fainting, which is also known as syncope.  For example, in 2015, the Secretary issued a notice of proposed rulemaking to modify the Vaccine Table to associate syncope with vaccinations administered by a needle when the syncope occurs within one hour of the vaccination.  80 Fed. Reg. 45132, 45136-37 (2015).[10]  The difference between one hour and 267 days should be obvious to all, including Mr. Downing.

Ms. Cottingham also did not explain why 267 days is an appropriate temporal interval between vaccination and fainting.  At best, Ms. Cottingham cites an unfiled medical article.  However, even in that medical article the longest interval between vaccination and onset of symptoms was two months, still much different from nearly nine months for K.C.

The second problem is that the petition's allegations seem to ignore the Vestavia Pediatrics records.  (Again, Mr. Downing possessed these records before he filed the petition).  The Vestavia Pediatrics records further undermine the reasonableness of the claim that the months-earlier vaccinations caused the fainting episodes.  The petition states: "on March 29, 2013, K.C. awoke, walked to the bathroom and passed out and hit her head."  Pet. ¶ 6, citing K.C.'s affidavit.  K.C.'s affidavit adds important facts that are not contained in the petition:  "the doctor . . . diagnosed me with dehydration, gastroenteritis and possibly the early stages of an intestinal virus."  Exhibit 1 ¶ 11.  The doctor did diagnose K.C. as suffering from dehydration.  Exhibit 3 at 80-81.  Dehydration was also a concern

---

[10] These rules recently became final.  82 Fed. Reg. 6294, 6300 (2017); 82 Fed. Reg. 11321 (establishing effective date of March 21, 2017).

for the second fainting episode, which occurred after K.C. did not eat breakfast and laid outside by a pool in warm weather.  Exhibit 3 at 70-71.

In her briefing, Ms. Cottingham did not address the soundness of the treating doctor's conclusion that dehydration caused K.C.'s fainting.  While the views of a treating doctor are not dispositive (see section 13), they are valuable.  Capizzano v. Sec'y of Health & Human Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006).  The petition does not account for the relatively benign and relatively common alternative explanation for fainting, dehydration.

In short, the claim that the July 5, 2012 vaccination caused fainting episodes in March and May 2015 borders on the outlandish, given that the treating doctor associated both episodes with dehydration.  But even if Mr. Downing saw more support for the fainting claim, the onset of this event appears to be March 29, 2013.  Thus, if Mr. Downing had dispensed with the claim regarding chronic headaches starting November 1, 2012, Mr. Downing could have delayed filing the petition and presented a claim for fainting within the statute of limitations months later.

### 3.   Menstrual Difficulties

The remaining claim appears to be that the July 5, 2012 vaccination caused K.C. menstrual difficulties, which began "in the latter part of 2013."  Pet. ¶ 9.[11]  The same two problems occur here --- a problem with the timing and a problem with the Vestavia Pediatrics records.  Implicitly, the petition seems to be claiming that a vaccination caused an injury that did not become manifest until more than a

---

[11] Inconsistently, Ms. Cottingham argued that "there were allegations of menstrual irregularity that began in September and October of 2012."  Pet'r's Reply, at 3-4.  The Reply cites no evidence on this point.

However, there is a record from Children's Hospital of Alabama about menstrual problems, but the onset of the menstrual problems is not particularly clear.  Exhibit 9 at 4-5 (Oct. 10, 2012).  It appears that the reference to September and October 2012 was an error in that the allegation is not consistent with the allegation in the petition.  In addition, the crux of Ms. Cottingham's argument regarding reasonable basis is that the statute of limitations compelled Mr. Downing to file the petition on October 30, 2015 because her first symptom (weekly headaches) started November 1, 2012.  If petitioner had wanted to contend that the HPV vaccination caused menstrual difficulties that began as early as September 2012, then the petitioner should have filed the petition in September 2015.

year after vaccination.  Again, the distance between these two events seems too long to support an inference of causation.

Moreover, the Vestavia Pediatrics records again call into question the assertions in the petition.  At her checkup in July 2013, K.C. told the pediatrician that "She's having monthly menses.  She is on an oral contraceptive per the gynecologist to help her regulate her periods and to help with acne."  Exhibit 3 at 96.  This record suggests that approximately one year after the vaccination, K.C. was not having problems menstruating.

Similarly, in her checkup in August 2014, K.C. reported that she has "Been doing well.  No concerns."  K.C. also stated the date of her last menstruation was July 25, 2014.  Exhibit 3 at 109.  The notation about her last period coupled with the report of "no concerns" suggests that K.C. was not having problems with her monthly cycle.

The Vestavia Pediatrics records also include information about when she started having problems menstruating.  A nurse's note from a telephone call records that K.C. "has not had a period in 4 mo."  Exhibit 3 at 174.  The record is dated May 14, 2015, meaning that K.C. last's period was probably January 2015 (four months before May 2015).  The next record is a nurse's note from a telephone call that K.C. "has been seen by Dr. Arbuckle because [she] has not had a menstrual cycle in 6 months."  Exhibit 3 at 175 (dated May 14, 2015).  This suggests that her last period was probably in November 2014 (six months before May 2015).

Collectively, these records support the assertion found in K.C.'s affidavit. She states in May 2015, she "went to the doctor because [she] had not had a menstrual period in 5 or 6 months."  Exhibit 1 ¶ 19.

Given this information, all of which was available to Mr. Downing before he filed the petition, it is unclear how the petition could assert that K.C.'s menstrual difficulties started at the end of 2013.  There is not a reasonable basis for asserting that K.C. was having menstrual difficulties in the latter part of 2013, let alone asserting the July 5, 2012 vaccinations caused menstrual difficulties more than a year later.  By K.C.'s affidavit, the onset of these problems was the end of 2014.

Exhibit 1 ¶ 19.  Thus, the statute of limitations for a claim of menstrual difficulties would expire at an unspecified time near the end of 2017.[12]

In defending the reasonable basis of her claim, Ms. Cottingham emphasizes that Mr. Downing had not received medical records from UAB Gynecology and Children's Hospital of Alabama.  Pet'r's Reply at 3.  However, Ms. Cottingham does not comment upon the information that Mr. Downing actually possessed before he filed the petition, most importantly the Vestavia Pediatrics records.  Ms. Cottingham characterizes the records from UAB Gynecology and Children's Hospital of Alabama as "important," but she fails to explain how they are important especially in light of the petitioner's affidavit and medical records from Vestavia Pediatrics that place the onset of menstrual problems at the end of 2014.

### 4.   The Attorney Did Not Accurately Assess the Information Available Before Filing the Petition

In short, "the totality of the circumstances" does not support Mr. Downing's decision to file a petition on October 30, 2015, when the petition contained allegations that were not consistent with the medical records that were available for Mr. Downing's review before filing the petition.  It is worth repeating that this analysis does not consider the information that Mr. Downing learned later from other medical records and from consulting Dr. Nemechek and Dr. Lee.  At the end of October 2015, when Mr. Downing was preparing the petition, he knew or should have known that there were considerable problems with the allegations that he was making on Ms. Cottingham's behalf, including the relative distant latency between the vaccination and the alleged onset of disorders.[13]  An appropriate

---

[12] If Mr. Downing had correctly alleged that K.C.'s menstrual difficulties began at the end of 2014, then the petition could have more directly implicated the second dose of the vaccination, which was given on August 18, 2014.  However, even under a chronology based upon the more recent vaccination, the interval between this vaccination and the onset of menstrual problems still exceeded three months.

[13] The undersigned has previously noted that the "totality of the circumstances" test, by considering the actions and omissions of the petitioner's attorney, creates a situation in which special masters may find that the petitioner's attorney did not act with appropriate diligence.  Bates v. Sec'y of Health & Human Servs., No. 13-154V, 2016 WL 6634924, at *17 (Fed. Cl. Spec. Mstr. Oct. 21, 2016).  The finding that Ms. Cottingham's petition was not supported by reasonable basis is not intended to denigrate Mr. Downing's performance generally.  Mr. Downing has skillfully and successfully represented many claimants in the Vaccine Program.

exercise of diligence from Mr. Downing could have prevented this situation entirely.

**Conclusion**

As an unsuccessful petitioner, Ms. Cottingham becomes eligible for an award of attorneys' fees and costs upon a showing that she met the statutory requirement that "there was a reasonable basis for the claim for which the petition was brought."  Here, she has not made that threshold showing.  Consequently, her motion for attorneys' fees and costs is DENIED.

**IT IS SO ORDERED**.

S/Christian J. Moran
Christian J. Moran
Special Master